CARNELL SMITH, on behalf of
himself and all others similarly situated,  et al.,                Case No. 1:18-cv-464

        Plaintiffs,                Black, J.
                Bowman, M.J.

    v.

FIFTH THIRD BANK,

        Defendant.

## REPORT AND RECOMMENDATION

On March 29, 2018, Plaintiff Carnell Smith filed this action as a putative class action against Defendant Fifth Third Bank ("Fifth Third") in the United States District Court for the Middle District of Florida.  The case was transferred to this Court on July 10, 2018. On October 15, 2018, Plaintiff Lenox Magee filed a similar putative class action against Fifth Third Bank in this Court.[1]  On November 15, 2018, that case, Case No. 1:18-cv-722, was fully consolidated into the above-captioned case. (Doc. 64).  The presiding district judge has referred this case to the undersigned magistrate judge for disposition of all pretrial and post-judgment motions, including through a report and recommendation on any dispositive matters.  (Doc. 45).

Fifth Third Bank ("Fifth Third") filed a motion to dismiss Plaintiff Smith's amended complaint, (Doc. 55), to which Smith filed a response and Fifth Third filed a reply. Following consolidation of the two cases, Fifth Third filed a second motion to dismiss as

---

[1]Plaintiff Magee's complaint does not contain a handwritten signature or typed /s signature, and is otherwise undated.

to Plaintiff Magee's complaint, (Doc. 70), to which Magee filed a separate response and Fifth Third, a reply.  In light of the two pending motions to dismiss, the undersigned initially stayed all discovery.

For the reasons stated, the undersigned now **RECOMMENDS THAT** Defendant's two motions to dismiss (Docs.55, 70) be **GRANTED IN PART** and **DENIED IN PART**.

## I.    Background

As a general rule, U.S. banks are for-profit institutions; customer fees provide one source of bank revenue.  (*See* Magee Complaint at ¶2, alleging "Fifth Third's ATM fee revenue is one of the primary sources of Fifth Third's profits.").  This case challenges the propriety of ATM fees charged by Fifth Third to its consumer accountholders.[2]  Fifth Third charges fees for use of ATMs owned or operated by other financial entities, known as "out of network" fees ("OON fees").  Plaintiffs Smith and Magee argue that Fifth Third improperly charged fees for balance inquiries at out-of-network ATMs.  Plaintiff Smith additionally objects to fees that he was charged for certain foreign transactions.  Both Plaintiffs seek recovery of the allegedly excess fees along with punitive damages and injunctive and declaratory relief.

Both Plaintiffs filed suit for breach of contract, with alternative claims for breach of the covenant of good faith and fair dealing.  Plaintiff Magee also asserts claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, and for Unjust Enrichment.  Plaintiffs attached the subject Agreement to their pleadings, comprised of:

---

[2] ATM stands for Automated Teller Machine.

(1) Fifth Third's Deposit Account Rules and Regulations; and (2) Fifth Third's Debit Card Disclosure and Card Agreement.[3]

Plaintiffs object to being charged multiple "per transaction" fees of $2.75 when they used a non-Fifth Third ATM in order to check their respective account balances through balance inquiries. Plaintiffs allege that on multiple occasions when they withdrew funds from an OON ATM following a balance inquiry,[4] they were charged $2.75 for the withdrawal, plus another $2.75 for the balance inquiry, for a total fee of $5.50 assessed by Fifth Third, not including additional fees assessed by the third party ATM operator.[5] Plaintiff Magee further alleges that on at least two occasions, he made balance inquiries at non-Fifth Third ATMs without a corresponding cash withdrawal or electronic funds transfer ("EFT"), but was still charged a $2.75 fee.[6] Plaintiffs allege that none of the "balance inquiry" fees were permitted by the Fifth Third Agreement.

Two portions of the Agreement contain general language concerning the fees that Fifth Third will impose on its accountholders. First, in its Account Rules and Regulations, under a subheading entitled "**Transfer Types and Limitations**," Fifth Third states:

> **Fees:** We reserve the right to impose a fee and to change fees upon notice to you. A fee may be imposed by an automated teller machine (ATM), and by any network used to complete the transaction, when you initiate an electronic fund transfer or make a balance inquiry.

---

[3]Plaintiff Magee did not attach the entirety of the Account Rules and Regulations, but only that portion that includes the fee schedule, as purportedly displayed on Fifth Third's website. Plaintiff Smith's second exhibit is partially illegible, in that the column of text on the far left side of the page is cut off. However, Plaintiffs referenced legible copies of the same exhibits at oral argument, and all parties agree that the critical language in both Plaintiffs' exhibits is identical. (*See generally* Doc. 52-1, 70-2).

[4] Plaintiff Smith alleges that this pattern occurred on March 3, 2017 and again on January 29, 2018. (Doc. 52 at ¶¶50-51). Plaintiff Magee alleges that this occurred on February 5, 2018. (Magee Complaint at ¶36).

[5] The owner or operator of the OON ATM charges separate and additional fees. Plaintiffs do not dispute those third-party fees and have filed suit only against their own bank, Fifth Third.

[6] Plaintiff Magee alleges this occurred January 23, 2018 and April 13, 2018. (Complaint at ¶¶35, 37)

(Doc. 52-1 at 23). Next, in the separate Debit Card Disclosure and Card Agreement, Fifth Third sets out the accountholder's agreement "to pay all fees we charge in connection with the Electronic Banking services you obtain." (Doc. 52-2 at 3, ¶8). The phrase "Electronic Banking services" is specifically defined as "deposits, transfers or withdrawals" via an ATM or other electronic means. (*Id.*)

The Agreement also sets forth a fee schedule. On pages 25-26 of the Account Rules and Regulations is a section captioned as "Consumer Account Pricing & Services," which sets forth the following fee schedule for use of OON ATMs:

| Fifth Third and Partner Networks ATM Fee | $0 – No charge to use Fifth Third ATMs or partner network ATMs |
|---|---|
| Non-Fifth Third ATM Fee | $2.75 for U.S. transactions<br>$5 for international transactions<br>Other ATM network owners may also assess a usage fee<br>No charge to use partner network ATMs |

The Debit Card Disclosure Agreement similarly states that a "$2.75 per transaction" fee will be imposed for any "Non-Fifth Third ATM transaction." (Doc. 52-2 at 3, ¶8).

The heart of Plaintiffs' claim rests on the position that a balance inquiry is not a separate "transaction" that is subject to a "per transaction" fee. Alternatively, Plaintiffs suggest that a balance inquiry made *in conjunction with* a cash withdrawal should be viewed as a *single* transaction for which only a *single* $2.75 fee may be assessed by Fifth

Third Bank.[7]  To be clear, Plaintiffs do not challenge the Bank's right to assess and collect a $2.75 fee for any deposit, transfer or cash withdrawal made at any non-Fifth Third ATM under the express terms of the Agreement.  Instead, Plaintiffs allege breach of contract based upon the assessment of a separate and/or additional $2.75 fee for a "balance inquiry."  In addition to the dispute about whether a balance inquiry is a transaction for which a separate fee may be charged, Plaintiff Smith includes additional claims regarding the assessment of "international transaction" fees.

## II.    Standard of Review

Unlike a motion for summary judgment, a motion to dismiss is directed to the sufficiency of the pleadings, with the Court's review limited accordingly.  Thus, in evaluating the pending motion under Rule 12(b)(6), the Court is required to "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir. 2007). While the determination of whether Plaintiffs' allegations state any claim rests primarily upon the allegations of their respective complaints, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir.

---

[7]Plaintiffs do not quarrel with the out-of-network ATM owner's right to charge them a separate fee in addition to any fees charged by Fifth Third and have named no other defendants. Thus, the undersigned finds irrelevant Plaintiff's argument that the OON ATM provided "no warning" on its screen that a balance inquiry "could cause a fee from either the ATM owner or the consumer's bank." (Doc. 62 at 6).  Additionally, contrary to this assertion, the Agreement clearly provides notice that an OON ATM owner or operator "may" charge Fifth Third customers a fee for a balance inquiry.  Fifth Third also would not be liable under banking regulations for the OON ATM operator's alleged lack of notice. *See generally, Azose v. Washington Mut. Bank*, 588 F. Supp.2d 366, 373 and n.2 (E.D.N.Y. 2008) (holding that Regulation E did not require ATM operator to provide notice to account-holding bank's customers of the latter bank's assessment of fee for a balance inquiry made on the operator's ATM, nor did account-holding bank have obligation under Regulation E to provide such notice).

2001) (internal quotation and citation omitted); *accord Luis v. Zang*, 533 F.3d 619, 632 (6th Cir. 2016).

The interpretation of contractual language is more commonly resolved on summary judgment than in the context of a motion to dismiss. However, the pending motions do not require review of any matters beyond the pleadings in this instance, because both Plaintiffs have attached the relevant contractual language as exhibits to their complaints. The parties do not quibble over the verbiage used in the contracts, but rather, dispute only the interpretation and meaning of those provisions. The standard of review applicable under Rule 12(b)(6) is therefore unchanged by this Court's review of the exhibits attached to the pleadings.

### III.    Analysis

Because of the similarity of Plaintiff Smith's Amended Complaint and Plaintiff Magee's Complaint, and the consolidation of the two cases for all purposes, this Report and Recommendation combines the arguments presented where appropriate, beginning with the common breach of contract claims as to whether a "balance inquiry" should be considered a "transaction." (Part III.A.) Next, the undersigned addresses Fifth Third's affirmative defense that the Plaintiffs' claims are barred by their failure to provide adequate notice. (Part III.B.) Following discussion of the claims and defenses applicable to both Plaintiffs, the undersigned addresses Plaintiff Smith's separate concerns with the "international transaction" fees. (Part III.C.). Last, the undersigned considers Plaintiff Magee's separate claim under Illinois state law (Part III.D.), and his claim of unjust enrichment. (Part III.E.)

### A. Breach of Contract Claims Based on Ambiguity of Critical "Per Transaction" Language

The fact that the Agreement constitutes a contract under Ohio law is undisputed, and the parties also agree that relevant language imposes "a fee" on the basis of a "per transaction" fee schedule. The primary issue that divides the parties is whether a "transaction" encompasses a "balance inquiry."

In Ohio, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter suited to initial determination by the court. *Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000). "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (internal quotation marks and additional citations omitted). "[C]ourts should examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (internal quotation and citation omitted). Additionally, courts should "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Id.* (quotation omitted).

Despite the parties' agreement about the centrality of the "per transaction" language, the Agreement does not define the term "transaction." Plaintiffs argue that the word "transaction" and related fee provisions are ambiguous, in which case they must be construed against Fifth Third as the drafter. In contrast, Fifth Third maintains that the meaning of "transaction" is plain and unambiguous. In Fifth Third's view, the term can

give rise to no other interpretation than that it categorically includes a "balance inquiry." Whether the relevant fee provisions are ambiguous, then, is this Court's first level of inquiry. "Only when a definitive meaning proves elusive should rules for construing ambiguous language employed." *State v. Porterfield*, 829 N.E.2d 690, 692-93, 106 Ohio St.3d 5 at ¶11 (Ohio 2005)).

In reviewing the Agreement as a whole, the undersigned answers this first level of inquiry in Plaintiffs' favor.  As Plaintiffs note, in addition to the "per transaction" fee schedule, the Debit Card Agreement explains that customers will be charged and contractually agree to pay fees "in connection with the *Electronic Banking services* you obtain." (Doc. 52-2 at 3, ¶8, emphasis added).  The Definitions section restricts "Electronic Banking Services" to those services that "allow you to access the Account using ATMs, telephones, and other devices *to make deposits, transfers or withdrawals* to or from the Account." (Doc. 52-2 at 2 (Definitions) and at 3 ¶8, emphasis added).  A third term in the Agreement is "electronic funds transfer" ("EFT"), or "funds transfer."  Although not defined by the Agreement, an EFT is defined by law as a transfer of funds via electronic means to credit or debit a consumer account.  *See* 15 U.S.C. § 1693a(7).  Given the customer's explicit agreement to pay fees for "Electronic Banking services" (which definition does not include balance inquiries), the similar definition of an EFT, and the lack of a definition for "transaction," a customer might reasonably equate the three terms: "electronic banking services," "electronic funds transfer" and "transaction."  Under that interpretation, because a "balance inquiry" is not a deposit, transfer or withdrawal, it would not be considered a

"transaction" for which a separate "per transaction" fee could be imposed. The dictionary meaning of the term "transaction" is consistent with this interpretation.[8]

The undersigned has closely reviewed Fifth Third's focus on different language that Defendant argues implicitly defines both a "balance inquiry" and "deposits, transfers or withdrawals" as separate types of transactions. In Fifth Third's view, the term "transaction" is a broad category that includes at least four elements: a subcategory of the three types of "electronic banking services" (deposits, transfers and withdrawals), the term "electronic funds transfer" (to the extent an EFT has separate meaning) <u>and</u> balance inquiries. As support, the Bank refers back to the "Fees" provision of the Agreement under the subheading "Transfer Types and Limitations," which states:

> We reserve the right to impose a fee and to change fees upon notice to you. A fee may be imposed by an automated teller machine (ATM), and by any network used to complete the transaction, when you initiate an electronic fund transfer or make a balance inquiry.

(Doc. 52-1 at 23). The Bank argues the second sentence provides a *contextual* definition for the word "transaction" as including either an "electronic fund transfer <u>or</u>…a balance inquiry." (*Id.*, emphasis added). The use of the conjunctive "or" arguably distinguishes between types of transactions: an "electronic fund transfer" or a "balance inquiry." Adding to that interpretation, Fifth Third relies on Debit Card language that specifically warns individual accountholders that they may be charged for "a balance inquiry" by an "ATM operator" separate and apart from the fee imposed for a "fund transfer":

> [W]hen you [accountholder] use an ATM <u>not owned by us</u>, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

---

[8] https://www.merriam-webster.co/disctionary/transaction , accessed on April 10, 2019, defining transaction as "an exchange or transfer of goods, services, or funds."

9

(Doc. 52-2 at 3, ¶19) (emphasis added).   Likewise, in the portion of the Debit Card Agreement attached as Exhibit 1 to the Magee Complaint, paragraph 19 states:

### 19. ATM TRANSACTION CHARGES

Your Account may be subject to charges when using an ATM that does not display the Fifth Third logo.  Also, when you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

(Magee Complaint, Doc. 1-1 at 3 in Case No. 1:18-cv-722).

Two problems exist with Fifth Third's reading of these provisions.  First, Plaintiffs' interpretation - that the customer's agreement to pay fees for "electronic banking services" is synonymous with "transaction"  - is implicitly reasonable for the reasons stated.  *See also, generally, Arlington Video Prods. v. Fifth Third Bankcorp.*, 569 Fed. Appx. 379, 387 (6th Cir. 2014) (interpreting reference to fee schedule on business account agreement as "unambiguous language" that "mean[s] that the Bank accepted a contractual obligation to disclose to its customers in writing on a 'Fee Schedule' all of the fees and charges 'associated with' the account or potentially applicable to the account."). Second, in context, the provisions on which Fifth Third relies refer only to fees charged by third party non-Fifth Third ATM owners or operators for a balance inquiry and not to the entirely separate issue of fees charged by Fifth Third itself for its customer's balance inquiry at a OON ATM.[9]

---

[9] Plaintiff points out that Fifth Third discloses a separate "balance inquiry" fee of $10.75 to its Business Checking Account customers.  However, as Fifth Third notes, that reference is unrelated to ATM fees; business accountholders pay no fee for ATM transactions whether or not the ATM is owned by Fifth Third. (Doc. 73 at 8).

Because the language is intended to address third party fees, a plausible construction of the language is that it warns Fifth Third customers that they may be charged for a balance inquiry by an ATM operator *even though a balance inquiry is not a traditional "transaction"* in the way that an "[electronic] fund transfer" falls within that definition.[10]   In fact, that reading is more consistent with the Electronic Funds Transfer Act, which provides regulatory context to the subject contracts.  *See* 12 C.F.R. §205.07(b)(11) (requiring "notice that a fee may be imposed by an automated teller machine operator as defined in § 205.16(a)(1), when the consumer initiates an electronic fund transfer or makes a balance inquiry, and by any network used to complete the transaction").  The same regulation defines an ATM operator as a party that "does not hold the account to or from which the transfer is made, or about which an inquiry is made," *see* 12 C.F.R. § 205.16(a), thereby excluding Fifth Third in this instance.[11]

Ignoring any parallels with regulatory language, Fifth Third seizes on the

_____

[10] Fifth Third's footnoted argument that the second clause of the second sentence in paragraph 19 can somehow be interpreted as independent authority for Fifth Third to charge its own customers for a balance inquiry is even less convincing.  (See Doc. 70-1 at 10, n.3).  The entirety of paragraph 19 clearly deals with ATM fees charged by non-Fifth Third entities, and cannot reasonably be construed to encompass balance inquiry fees charged by Fifth Third to its own customers.

[11] Although the Court's analysis is limited to the four corners of the Agreement, the Court takes judicial notice that the subject Agreement arose in one of the most highly regulated industries in the United States. Pursuant to Regulation E of the Electronic Funds Transfer Act, banks are required to provide their accountholders with adequate notice of fees through initial disclosures provided at the time the consumer contracts for electronic fund transfer services.  *See generally* 15 U.S.C. §1693, *et seq.*; 12 C.F.R. §207(b)(5) (requiring disclosures for "[a]ny fees imposed by the financial institution for electronic fund transfers or for the right to make transfers"); *see* also 2011 WL 11544971 at *2 (O.C.C. Oct. 1, 2011) (advising that "[o]ther fees, for example, minimum balance fees, stop-payment fees, account overdrafts, or ATM inquiry fees, may, but need not, be disclosed under Regulation E." (internal citations omitted, emphasis added)).  In 2001, Regulation E was first amended to require disclosures of ATM fees, including "notice that a fee may be imposed by an automated teller machine operator as defined in § 205.16(a)(1)…."  *see* 12 C.F.R. § 205.07(b)(11). It was then that ATM operators also were required to disclose their fees to the ATM user on the ATM screen itself.  *See* 12 C.F.R. § 205.16.  Amendments to Regulation E thus reflect a concern with ATM fees charged by third party owners and operators.

grammatical construction of the sentence: "A fee may be imposed by an automated teller machine (ATM), and by any network used to complete **the transaction**, when you initiate **an electronic fund transfer or make a balance inquiry**," as implying the inclusion of both EFTs and balance inquiries within the definition of "transaction." Plaintiff Magee argues the parsed language "misuse[s]…the word transaction" and applies it only to third party fees. (Doc. 72 at 15 n.2). Again, reviewing the Agreement as a whole, the undersigned agrees that the provision relates only to OON owners and operators of ATMs.[12] For the reasons stated, the admittedly awkward use of the term "transaction" in a provision that relates solely to third parties appears to be inconsistent with the reasonable construction of the same term as it relates to Fifth Third's own fees.

Fifth Third also points to unrelated international ATM fee language in an effort to persuade this Court to view the term "transaction" as broad enough to include a "balance inquiry." Fifth Third notes that the fee schedule lists a fee of $5.00 for an "international ATM Withdrawal," whereas the domestic fee schedule indicates a fee of $2.75 "per transaction" at any "Non-Fifth Third ATM." Fifth Third argues that this is evidence that "transaction" must mean something more than merely a "withdrawal."[13] The undersigned does not disagree, but finds more reasonable a definition that is synonymous with EFTs or electronic funds services (meaning deposits, transfers and withdrawals).

---

[12] *See also, generally* 12 C.F.R. §§ 207(b)(11) and 207(b)(16). Of note, the March 6, 2001 comments published by the Board of Governors of the Federal Reserve System regarding revisions to Regulation E explained that the Graham-Leach-Billey Act "treats a balance inquiry as an EFT for purposes of the ATM fee disclosure requirement," but that based on comments, the definition in 12 C.F.R. §205.3 "does not include a balance inquiry as an example of an 'electronic fund transfer,' since such an inquiry does not fit within the literal definition of a 'fund transfer.'" 66 FR 13409-01, 2001 WL 212452 (March 6, 2001)

[13] Undermining Fifth Third's own argument, another portion of the Agreement refers to the $5 fee as applicable to any "international transactions."

Despite concluding that "transaction" is ambiguous in the Agreement, the undersigned is not wholly convinced by *all* of Plaintiffs' arguments. For example, Plaintiff Smith emphasizes the use of the singular tense in the first sentence of the fee provision, in which Fifth Third states that it "reserve[s] the right to impose <u>a</u> fee," in support of his argument that only a *single* $2.75 "fee" can be assessed for any *single* trip to an ATM. (*See* Doc. 52-1 at 23). However, the Agreement uses the plural form "fees" in the latter half of the same sentence: "We reserve the right to impose a fee and to change <u>fees</u> upon notice to you." (*Id.*) In addition, Plaintiff Magee conceded at oral argument that "deposits" and "transfers" and "withdrawals" all constitute separate types of transactions, for which multiple $2.75 per transaction fees (hypothetically) could be imposed on a "per transaction" basis even if those transactions occurred sequentially during a customer's single trip to a non-Fifth Third ATM.

The undersigned also is not fully persuaded by Plaintiffs' argument that the sentence: "A fee may be imposed by an automated teller machine (ATM), and by any network used to complete the transaction, when you initiate an electronic fund transfer or make a balance inquiry," should be viewed as a "nonessential clause." *See Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (holding that under Ohio law, a court must "give meaning to every paragraph, clause, phrase, and word, omitting nothing as meaningless or surplusage.") Nevertheless, the undersigned agrees that the grammatical construction is reasonably interpreted *on the whole* as meaning only that a non-Fifth Third ATM or non-Fifth Third network may impose a fee for an EFT, and may also impose a fee for a balance inquiry - not that Fifth Third may do so.

Based upon the undersigned's conclusion that the definition of "transaction" in the Agreement is at least ambiguous, and does not definitively include a "balance inquiry," the undersigned recommends denying Fifth Third's motions to dismiss the Plaintiffs' "balance inquiry" breach of contract claims. For the same reasons, the undersigned recommends denying Fifth Third's separate motion to dismiss Plaintiffs' closely related (alternative) claim for breach of the implied covenant of good faith and fair dealing.

### B. Fifth Third is not Entitled to Dismissal Based on Notice Provision

As an alternative argument in support of dismissal even if this Court finds the term "transaction" to be ambiguous, Fifth Third maintains that all contractual claims are subject to dismissal as "foreclosed under the express terms of the Deposit Account Rules & Regulations." (Doc. 55-1 at 23). In support, Fifth Third cites to the following provision:

> Customer agrees to carefully examine and reconcile account statements and that statements may be mailed or made available to the last known address as carried on the records of Bank or made available to Customer via other means, i.e., Internet banking. Customer agrees that Bank will not be liable if Customer fails to exercise ordinary care in examining their statements. *Customer will notify Bank of any discrepancy with any item, including, but not limited to, deposits, withdrawals, and checks, within thirty (30) days of the statement mailing or made available to customer date.* Customer will also notify Bank of any forgery or alteration of any item within thirty (30) days of the statement mailing or made available to customer date. *If notification is not received, Bank will have no liability for such item(s).* Customer also agrees that Bank will have no liability if the item is forged, altered or counterfeited in such manner that the fraud could not be detected by a reasonable person. Customer assumes all liability for unauthorized signatures produced by a facsimile signature device or stamp.

(Doc. 52-1 at 9, ¶1) (emphasis added). The Debit Card Agreement includes a similar provision but allows for 60 days, rather than 30 days, to provide notice of transactions that were not undertaken or authorized by the accountholder. (*See* Doc. 52-2 at 1, ¶24; *see also* Doc. 52-1 at 23 and 24 for additional "notice" provisions concerning theft or fraud

14

for unauthorized electronic fund transfers, including a two business day provision (for loss or theft of password/PIN), a sixty-day provision for "transfers that you did not make or that were not authorized by you," and an "Error Resolution" provision "[i]f you think your statement or receipt is wrong").

Fifth Third asserts that Plaintiffs' failure to give notice of the fee dispute within a thirty-day window of the statement on which the fees were recorded bars Plaintiffs' claims, because such "notice" is a condition precedent to suit. In support, Fifth Third relies chiefly on an unpublished Ohio Court of Appeals commercial litigation case from more than twenty years ago. In *Moraine Materials Co. v. Cardinal Operating Co.*, 1998 WL 785363, (Ohio Ct. App. 2nd Dist., Nov. 13, 1998), a waste disposal company alleged a breach of contract, leading to nearly a million dollars in lost profits, based upon the failure of two power companies to produce a specified amount of waste. The plaintiff did not file suit until over a year after the conclusion of the contracts, despite "notice" provisions that required it "to make any request for additional compensation on or before the 15th day of the succeeding month after any cost or damage was incurred." *Id.*, 1998 WL 785363, at *1. At trial, a jury concluded that although the power companies had breached their contractual obligation to produce the specified amount of waste, their liability was excused by the plaintiff's failure to provide formal notice during the monthly billing cycles. On appeal, the Ohio Court of Appeals affirmed, holding that the notice provision was a "condition precedent" to any claim.

> The notice provision in the contracts operated as a condition precedent to Moraine's right to claim any damages from default by the appellees. Its operation as a condition precedent was evident from the language providing that "[u]nless such [written] statements are made, Contractor shall not be entitled to payment on account of the cost or damage."

*Id.*, 1998 WL 785363, at *6.

The Ohio Court of Appeals emphasized that the notice provision in the context of commercial contracts differs from Ohio's view on notice provisions in insurance contracts. In the insurance context, the court observed that Ohio courts had recently held that "a failure to give notice as required by a contract of insurance would only bar claims if the insurer *were prejudiced* by the lack of notice." *Moraine Materials Co.*, 1998 WL 785363, at *7 (additional citations omitted) (emphasis added); *accord Ferrando v. Auto-Owners Mut. Ins. Co.*, 781 N.E.2d 927, 944–45, 98 Ohio St.3d 186, 205, 2002-Ohio-7217, ¶ 79 (Ohio 2002) ("Ohio does not follow the traditional rule in late-notice cases but follows the modern trend of inquiring into prejudice"). Thus, *Moraine* is distinguishable. Unlike the arms-length commercially negotiated contracts at issue in that case, the contracts here bear closer resemblance to adhesion contracts presented in the insurance context.

Fifth Third's reliance on *Gollihue v. Nat'l City Bank*, 969 N.E.2d 1233, 1237-38 (Ohio App. 10th Dist. 2011), is similarly unpersuasive, despite involving a banking account agreement. Mr. Gollihue had closed a joint account with his spouse, who had a gambling problem, and reopened a new account in his own name after being reassured that his wife would not be able to access it. After his wife died, plaintiff discovered that prior to her death she had presented allegedly forged signatures on withdrawal slips to deplete the account. He filed suit two and a half years after the allegedly unauthorized withdrawals. On the basis of a 60-day notice provision for claims based on unauthorized signatures, a one-year contractual notice limitation for all claims, and an Ohio statute that further requires bank customers to report unauthorized signatures within one year, the trial court granted summary judgment to the bank. The Ohio Court of Appeals reversed,

holding that the trial court had erred in characterizing the contractual notice provisions and the Ohio statute as a statute of limitations, as opposed to a condition precedent for recovery of damages. *Id.*, 969 N.E.2d at 1238, 2011-Ohio-5405 at ¶ 19.

Like *Moraine, Gollihue* is distinguishable. In addition to its differing procedural posture and the longer time specified in that notice provision, the Ohio court pointed out that Mr. Gollihue did *not* challenge "the validity of the contractual notice requirements," but argued only that "the evidence establishes that he timely notified NCB of the unauthorized signatures and withdrawals and of his claims against the bank." *Id.* at ¶20. By contrast, Plaintiffs here vigorously dispute the validity and applicability of the notice provision to Fifth Third's imposition of *its own fees*, as opposed to the forged signatures at issue in *Gollihue*. It is true that in isolation, the italicized language requires notice of "*any* discrepancy with *any* item" and that the list of items that follows states that it "*includ[es], but [is] not limited to* deposits, withdrawals, and checks." However, read as a whole, the provision is reasonably construed as focused on forgeries, fraud, and other alterations by third parties - the type of discrepancies for which Fifth Third would rely upon its accountholders to provide it with notice. Nowhere in the referenced notice provision is there any explicit or implicit reference to fees imposed by Fifth Third itself, according to its own interpretation of its fee schedule. As Plaintiffs point out, Fifth Third presumably would have no need of notice of those fees.

Other portions of *Gollihue* suggest that the notice provision here may be either inapplicable or unenforceable. In *Gollihue*, the court acknowledged that the contractual language "unambiguously" required written notice. Still, the court allowed that "in some circumstances, *courts will not strictly enforce contractual language requiring notice in*

*writing*" and that "a failure to give notice in writing, as required by a contract, will not *necessarily* preclude recovery on the contract." *Id.*, 969 N.E.2d at 1238, ¶ 22 (emphasis added). The *Gollihue* court also cited construction contract cases in which the failure of notice was construed as "harmless." *Id.*, at ¶ 23 (citations omitted). On the basis of that case law and ambiguities in the factual record that included evidence of Gollihue's prompt oral notification within 60 days of his wife's death, the appellate court found summary judgment to be improper.

Plaintiffs cite to the more recent construction of a virtually identical notice provision in *Arlington Video Prods. Inc. v. Fifth Third Bankcorp.*, 569 Fed. Appx. 379, 390 (6th Cir. 2014), in which the Sixth Circuit reversed a grant of summary judgment. In *Arlington* the customer also alleged a breach of contract based upon Fifth Third's allegedly excessive service fees.[14] Fifth Third relied on the notice provision to argue that the customer's failure to provide notice within 30 days of "any discrepancy with any item" operated as a statute of limitations that barred the claim. The Sixth Circuit agreed that "[u]nder Ohio law, parties can agree … to shorten the applicable statute of limitations if the time limit is reasonable and the contract language is clear and unambiguous." *Id.* at 390. However, the Sixth Circuit reversed because the referenced provision did not meet that high standard.

Fifth Third attempts to distinguish *Arlington* because the court held only that the notice provision did not operate as a statute of limitations, and did not consider whether it would operate as a "condition precedent" to bar recovery under Ohio law. However,

---

[14] In *Arlington Video Productions, Inc.*, the notice provision was attached to the plaintiff's business account as opposed to a consumer deposit account, and the fees at issue were not related to ATM transactions.

*Arlington* evinces considerable skepticism toward applying the notice provision to the consumer's challenge to Fifth Third's fees: "At most this paragraph attempts to release the Bank from liability if its customer fails to exercise ordinary care in examining and reconciling its bank statements and fails to notify the Bank of "any discrepancy with any item" within thirty days." *Id.* (emphasis added).

The undersigned is unpersuaded by Fifth Third's argument that it is entitled to dismissal based on the "condition precedent" nature of the notice provision. Contrary to Fifth Third's position, case law suggests: (1) the notice provision does not clearly and unambiguously apply to the bank fees at issue; (2) to interpret the notice provision to apply to bank fees could be viewed as hypertechnical and unconscionable; (3) the short 30-day time limit may be unreasonable as applied to Fifth Third's imposition of fees; and/or (4) any violation could be viewed as "harmless" in the context of adhesion contracts in the banking industry. *See generally, Hackman v. Szcygiel*, 2006 WL 3199278 at *3 (Ohio Ct. App. Nov. 7, 2006). At the Rule 12(b)(6) stage, the undersigned also rejects Fifth Third's arguments that Plaintiffs' breach of contract and breach of implied covenant of good faith and fair dealing claims are "waived," (Doc. 70-1 at 19), as that argument is unsupported by Fifth Third's own cases. *See Moraine Materials*, 1998 WL 785363 at *6 (rejecting position that failure of notice operated as an estoppel or waiver of claims). Moreover, this Court has held that a plaintiff is not required "to anticipate and plead facts sufficient to defeat an affirmative defense." *Astar Abatement, Inc. v. Cincinnati City School Dist. Bd. of Ed.*, 2012 WL 481799 at *3 (S.D. Ohio Feb. 14, 2012) (holding that dispute as to whether plaintiff met contractual notice requirements could be addressed more properly at summary judgment stage). Therefore, the undersigned recommends

19

denial of Fifth Third's motions to dismiss based upon the Plaintiffs' alleged failure to comply with the 30-day notice provision.

## C. Foreign Transaction Fees Not Ambiguous

In a departure from the claims jointly presented, Plaintiff Smith includes additional claims based on Fifth Third's imposition of international transaction fees. The undersigned concludes that Fifth Third is entitled to dismissal of those claims.

In his first dispute over foreign transaction fees, Smith argues that it is improper to assess an international transaction fee on any withdrawals made in U.S. currency, even if the withdrawal occurs at an ATM outside of the United States, as occurred when Smith withdrew $200.00 in cash from a non-Fifth Third ATM in Jamaica in 2016. (Doc. 52 at ¶¶65-68).[15] Second, Smith argues that the international transaction fee that is assessed, as calculated in percentage terms, may be applied only to the sum ($200.00) that Smith designated for withdrawal, and not to the total sum of the withdrawal and the international usage fee ($205.00).

The Debit Card fee schedule states that Fifth Third will charge "$5 for international transactions" as a "Non-Fifth Third ATM Fee," and that an additional "International POS/ATM Transaction Fee" will be assessed at the rate of "3% of the transaction amount." (Doc. 52-1 at 28). The "Rules & Regulations" portion of the Agreement includes nearly identical language, stating that the fee for an "International ATM Withdrawal" [as opposed to "international transaction"] is $5, but otherwise using identical "3% of the

---

[15] Smith alleges that additional claims arose on November 3 and 6, 2017, when he withdrew U.S. Dollars from ATMs located in the Dominican Republic.

transaction amount" language for the assessment of the point of service transaction fee.

The Account Rules & Regulations contain the following language:

14. FOREIGN CURRENCY TRANSACTIONS

We will assess an international transaction fee equal to 3% of the U.S. dollar amount of each *foreign transaction.* The international transaction fee is in addition to the currency conversion fee assessed by Mastercard. If a transaction is made in a foreign country, Mastercard will convert the transaction into a US dollar amount and assess a currency conversion fee equal to 20% of the transaction total.....

(Doc. 52-2 at ¶14, emphasis added; *see also id.* at ¶8, listing $5 fee plus "3% of the transaction amount."). In a Definitions section, the Agreement specifically defines a "foreign transaction" as: "A transaction that occurs or is submitted to us from outside the United States or in a foreign country." (Doc. 52-2 at 1).

Smith's first claim, that Fifth Third was not permitted to assess an "international transaction fee" so long as his withdrawal was made in U.S. dollars rather than foreign currency, improperly over-emphasizes the word "Currency" in a subtitle of one paragraph of the Agreement. (Doc. 52-2 at ¶14). There is no ambiguity here. The referenced provisions offer neither any explicit exception to transactional fees made in a foreign country if the withdrawal is made in U.S. dollars, nor any reasonably construed implicit exception for a transaction made in U.S. dollars if that transaction "occurs or is submitted to us from outside the United States or in a foreign country." Plaintiff's strained interpretation is implausible and unreasonable. The real estate mantra: "Location, location, location" applies. The Agreement's foreign or international transaction fees are not dependent upon the type of currency involved, but clearly and unambiguously on the location at which the transaction occurs.

Plaintiff Smith's claim that Fifth Third was not permitted to assess the POS/ATM fee of 3% on the total sum of currency withdrawn plus any usage fees present only a slightly closer issue. The Agreement clearly specifies that the percentage is to be calculated on the sum of the "transaction amount," as opposed to the "withdrawal amount." As discussed above, the term "transaction" is undefined.

Fifth Third argues that the only reasonable interpretation is that "the transaction amount is the total amount debited by the [foreign] ATM owner," (Doc. 55-1 at 19), which amount would necessarily include the usage fees associated with foreign transactions. Thus, in the case of Plaintiff's cash withdrawal in Jamaica, Fifth Third insists that its percentage fee was appropriately assessed against the entire "transaction" amount of $205.00, rather than the amount of cash withdrawn exclusive of the usage fee.[16] By contrast, Plaintiff Smith's interpretation requires an assumption that "transaction" is not only equivalent to, but limited to the "withdrawal" amount.

Consistent with the analysis of the word "transaction" in the domestic context, the undersigned concludes that the most plausible interpretation of "transaction" equates that term to an ETF or electronic banking service, meaning it is a "deposit[], transfer[] or withdrawal." The foreign usage fee falls within that category. Plaintiff Smith may have withdrawn only $200.00 in currency when in Jamaica, but a total of $205.00 was withdrawn and/or transferred (debited) from his Fifth Third account for that international transaction. The undersigned concludes that Fifth Third's construction is reasonable, and Plaintiff's Smith's attempt to create ambiguity is not. Accordingly, the undersigned

---

[16] Unlike the claims concerning the fees assessed for domestic transactions, Smith does not allege that he conducted a balance inquiry (or was assessed any corresponding fee) in connection with his cash withdrawal from an ATM in Jamaica.

22

recommends granting Fifth Third's motion to dismiss any and all claims associated with Plaintiff Smith's challenge to the assessment of international transaction fees.

### D. Ohio Choice-of-Law Precludes Illinois State Law Claim

Plaintiff Magee's complaint includes a separate claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). However, the Agreement contains an enforceable choice-of-law provision providing that "[t]he laws of the United States and the laws of Ohio govern this Card Agreement regardless of your or any User's place of residence." (Magee Complaint at Ex. 1, ¶16). The Rules and Regulations contain a similar provision that "[t]he laws of the United States and the State of Ohio govern this Agreement regardless of the Customer or User's place of residence and all transfers are agreed to be originated within the State of Ohio." (Docs. 52-1 at 25 and Doc. 70-2 at 25). Fifth Third persuasively argues that the choice-of-law provision bars Plaintiff's ICFA claim, because the ICFA claim is closely related to the underlying contractual dispute.

Plaintiff Magee protests that the choice-of-law language should be construed narrowly to encompass only claims under the "Agreement," as distinguished from his non-contractual ICFA claim. He describes his ICFA claim as a wholly separate consumer protection claim arising out of Fifth Third's "deceitful conduct." (Doc. 72 at 24). In an attempt to differentiate his ICFA claim, Magee asserts that it rests on the "inaccurate advertising of ATM fees on [Fifth Third's] website (including misrepresenting the imposition of OON Fees for balance inquiries)" as opposed to the terms of the Agreement. Plaintiff points out that the "pricing brochure" can be found on Fifth Third's website. However, Plaintiff's complaint does not contain *any* allegations about deceptive "advertising" on Fifth Third's website or elsewhere. Instead, and contrary to Plaintiff's

argument, the Complaint explicitly defines the "pricing brochure" as part and parcel of the parties' <u>contractual</u> Agreement. (Complaint at ¶¶ 3, 11). Relevant allegations brook no distinctions between the factual underpinnings of the ICFA claim and the breach of contract claim. (*See, e.g.*, Complaint at ¶ 65, alleging that "Fifth Third misrepresented or omitted its authority to charge [balance inquiry]…fees. The contract between Fifth Third and accountholders did not authorize…these fees."; *see also id.* at ¶¶5, 6, 64, 66, 67).

At the end of the day, the undersigned finds the ICFA "misrepresentation" claims to be so closely related to the breach of contract claims that the Ohio choice-of-law provision should be applied. *See, e.g.*, *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1139-40 (6th Cir. 1991) (concluding that choice-of-law provision that stated that the "Agreement and construction thereof shall be governed by the laws of the state of Michigan" applied to closely related tort claims of fraud and misrepresentation); *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993) (holding that choice-of-law contractual provision applied to closely related fraud and misrepresentation claims, drawing a distinction from the application of a contractual choice-of-law provision to "only…tangentially related" claims); *Baumgardner v. Bimbo Food Bakeries Distrib., Inc.*, 697 F. Supp.2d 801, 804-06 (N.D. Ohio 2010) (holding intentional interference and unjust enrichment claims are "very closely related" to breach of contract claims, and applying contractual provision that specified that the "validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of New York"); *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, 2016 WL 5390412 at **3, 11 (N.D. Ohio Spt. 27, 2016) (holding that provision that stated "[t]he terms and provisions of this Agreement shall be construed under and governed by the

laws of the State of Ohio…" barred claim under California's Unfair Competition Law where allegations related to performance of the contract); *Klopfenstein v. Fifth Third Bank*, 2015 WL 1468382 at **8-9 (S.D. Ohio Mar. 30, 2015) (dismissing similar ICFA claim because the parties Agreement specified that the law of Ohio would apply).   Even if Plaintiff Magee attempted to amend his complaint to more clearly allege that the ICFA rests on "distinct" pre-contractual advertising, the undersigned still would recommend that Fifth Third's motion to dismiss the ICFA claim be granted.  *See Janice Doty Unlimited, Inc. v. Stoecker*, 697 F. Supp. 1016, 1020-21 (N.D. Ill. 1988) (holding that Georgia choice-of-law provision applied to bar ICFA claim even though alleged fraudulent misrepresentations took place *before* the parties entered into their contract).

The cases relied upon by Plaintiff to support a narrower interpretation of the choice-of-law provision are distinguishable. For example, *In re E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation*, 316 F. Supp.3d 1021, 1028-29 (S.D. Ohio 2015) involved a choice-of-law provision in a Settlement Agreement in complex multi-district litigation ("MDL") in which the prior Settlement had specifically "preserved" and "carved out" certain personal injury and wrongful death claims to be litigated separately at a later date.  *Id.* at 1026-27.   The court held that the choice-of-law provision in the Settlement Agreement was not applicable to the "carved out" tort claims because it was "plainly intended to address disputes that arise from the performance of the Parties' obligations under that [Settlement] Agreement." *Id.* at 1028.  Likewise, in *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide*, Inc., 852 F. Supp.2d 925, 938-39 (S.D. Ohio 2012), the issue of whether the subject agreement was valid and enforceable was itself a hotly contested issue, and the plaintiff had pleaded tort and quasi-contractual

claims as an alternative to breach of contract. Within that context, the court held that the choice-of-law provision regarding "this agreement" would not "govern the extra-contractual rights and duties of the parties." *Id.* at 936.[17] By contrast, there is no dispute here that the parties' Agreement is valid and enforceable.

Having concluded that the choice-of-law provision bars Plaintiff Magee's closely related ICFA claim, the undersigned finds no need to reach Fifth Third's alternative arguments that Plaintiff has failed to state any claim under the ICFA for other reasons, even if the conflict-of-law provision is not applied. *But see generally Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (rejecting "restatements of the claimed breach of contract…using the language of fraud" as insufficient to state claim under ICFA because "the consumer-fraud and contract claims rest on the same factual foundation; no distinct deceptive acts are alleged").

### E. No Claim is Stated for Unjust Enrichment

Last, the undersigned recommends dismissal of Plaintiff Magee's "unjust enrichment" claim. Plaintiff's memorandum in opposition to Fifth Third's motion does not respond to any of Fifth Third's well-reasoned arguments in favor of dismissal of this claim. "[U]nder Ohio law '[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another.'" *Klopfenstein v. Fifth Third Bank*, 2015 WL 1468382, at *8 (quoting *Wuliger v. Manufacturers Life Ins. Co.,* 567 F.3d 787, 799 (6th Cir.2009)) (emphasis

---

[17] As compared to the body of case law cited above, the undersigned also finds less persuasive the *ExamOne* court's reliance on and citation to a single Fifth Circuit case for the proposition that a choice-of-law provision that referenced the "'[t]his agreement'…was not broad enough to encompass tort and quasi-contract claims." *Id*, 852 F. Supp.2d. at 936.

original, additional citations omitted).  Because the unjust enrichment claim is based on the subject matter of the parties' express Agreement, Fifth Third's motion should be granted as to this claim.

**IV.  Conclusion and Recommendations**

Accordingly, **IT IS RECOMMENDED THAT** Fifth Third's motion to dismiss Plaintiff Smith's amended complaint (Doc. 55) and the motion to dismiss Plaintiff Magee's complaint (Doc. 70) be **GRANTED IN PART** and **DENIED IN PART**.  For the reasons stated, Fifth Third's motions should be **DENIED** with respect to both Plaintiffs' "balance inquiry" claims, but should be **GRANTED** concerning Plaintiff Smith's international transaction claims, and Plaintiff Magee's ICFA and unjust enrichment claims.

_s/ Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CARNELL SMITH, on behalf of
himself and all others similarly situated,                    Case No. 1:18-cv-476

        Plaintiff,                                                              Black, J.
                                              Bowman, M.J.
      v.

FIFTH THIRD BANK,

        Defendant.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).